HERMINIO MADERA, ETC., ET AL., demandantes y recurridos, v. METROPOLITAN CONSTRUCTION CORPORATION ET AL., demandados y recurrente la primera; EULOGIO RIERA, tercero demandado; HERMINIO MADERA, ETC. y JOAQUINA RODRÍGUEZ EMA DE MADERA, demandantes y recurrente el primero, v. METROPOLITAN CONSTRUCTION CORPORATION, EULOGIO RIERA y MARTA RODRÍGUEZ EMA DE RIERA, demandados y recurridos; HERMINIO MADERA, ETC., ET AL., demandantes y recurridos, v. METROPOLITAN CONSTRUCTION CORP., EULOGIO RIERA y MARTA RODRÍGUEZ EMA DE RIERA, demandados y recurrentes los dos últimos.

*Números:* R-62-188, R-62-193, R-62-195 *Resueltos:* 29 de diciembre de 1967

V. M. *Sánchez Fernández, Dubón & Dubón* y A. *Torres Braschi,* abogados de la Metropolitan Construction Corporation; *Sergio G. Gelpí* y *Oscar Castro Rivera,* abogados de Herminio Madera; *Félix Ochoteco, Jr.,* abogado de Joaquina Rodríguez de Madera; *Orlando J. Antonsanti,* abogado de Eulogio Riera.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El día 4 de enero de 1960 los señores Herminio Madera y Eulogio Riera, sin la concurrencia de sus respectivos cónyuges, otorgaron un contrato privado de compraventa suscrito antes notario mediante el cual vendieron a la Metropolitan Construction Corporation una parcela de terreno perteneciente a las sociedades de gananciales que tenían constituidas con sus esposas.(1) Cuatro meses y medio des-

---

(1) "COMPRAVENTA.—En la ciudad de San Juan, Puerto Rico, a los cuatro días de el mes de enero de mil novecientos sesenta.—COMPARECEN.— DE UNA PARTE: Los Señores Don Herminio Madera, mayor de edad, comerciante, casado con Doña Joaquina Rodríguez Ema y Don Eulogio Riera mayor de edad, abogado, casado con Doña Marta Rodríguez Ema y ambos vecinos de San Juan, P.R.—DE OTRA PARTE: La Metropolitan Construction Corporation, una corporación organizada de acuerdo a las leyes de el Estado Libre Asociado de P.R. y representada en este acto por su presidente don Jorge I. Rosso.—Manifiestan las partes que tienen convenida

pués, en 16 de mayo, se promovió por la señora Rodríguez Ema de Madera un pleito sobre sentencia declaratoria para que se determinara que, en ausencia de su consentimiento expreso, el contrato de referencia no afectaba el título dominical que tenía la sociedad de gananciales sobre el condo-

---

entre sí la compraventa de la propiedad que más adelante se describe y la que llevan a cabo bajo las siguientes cláusulas y condiciones.

PRIMERO:—Que los Sres. Don Herminio Madera y Don Eulogio Riera junto a sus respectivas esposas son dueños de la siguiente propiedad:

PARCELA de terreno radicada en la jurisdicción de Carolina, Puerto Rico, en el lugar denominado Hato de Cangrejos Arriba, que tiene una cabida aproximada de tres cuerdas y media y cuyas colindancias son las siguientes:—por el Norte con el océano Atlántico; por el Sur, con la carretera Insular Núm. 57 que conduce a Carolina, por el Este con Arthur Henry Noble y por el Oeste con la Sucesión Rodríguez Ema.

—Esta parcela se encuentra inscrita al folio 128 del tomo 66 de Carolina, finca Núm. 2967, inscripción primera.

—Esta propiedad según manifiestan los Sres. Madera Riera se encuentra libre de cargas y gravámenes.

—Los señores Herminio Madera y Eulogio Riera por el presente documento VENDEN y la Metropolitan Construction Corporation por representación de su presidente Don Jorge I. Rosso COMPRA la anteriormente descrita propiedad sujeto a las siguientes cláusulas y condiciones:

—(A) El precio de compraventa será la suma de CUATROCIENTOS MIL DÓLARES ($400,000.00) de los cuales reciben los vendedores en este acto la suma de CINCUENTA MIL DÓLARES ($50,000.00) y el balance de el precio aplazado tan pronto sea elevado este acto a escritura pública.

—(B) Es convenido entre las partes además que en caso de que la parcela anteriormente descrita no resultare con una cabida superficial al efectuarse su mensura de 12,854 metros esta compraventa quedará rescindida y sin efecto alguno.

—Enteradas las partes de el contenido de este documento, lo aceptan en todas sus partes por estar de acuerdo a sus deseos e instrucciones.

—Y para que así conste suscriben el mismo en San Juan Puerto Rico hoy día 4 de enero de 1960.

(Firmados) Eulogio Riera.—Eulogio Riera.—Herminio Madera.—Herminio Madera.—Metropolitan Construction Corp. por Jorge I. Rosso.—(firmado) J. I. Rosso.—Aff. Núm. 2863.—Suscrito y Reconocido ante mí por Don Herminio Madera, Don Eulogio Riera y Don Jorge I. Rosso, todos de las circunstancias personales anteriormente expresadas y a quienes conozco personalmente en San Juan, P.R., hoy día 4 de enero de 1960. (firmado) Manuel Martín Maldonado.—Notario Público."

minio que le correspondía en la finca mencionada.(2) Figuraron como partes demandadas la corporación compradora, los esposos Riera-Rodríguez Ema y el señor Madera.(3) Al formular su contestación, la Metropolitan presentó una reclamación que denominó demanda contra tercero contra los señores Madera y Riera(4) en solicitud de que se les condenara a satisfacer los perjuicios causádosle por las representaciones hechas por éstos al efecto de que tenían autorización de sus respectivas esposas para realizar la venta.

Dirimiendo el conflicto de la prueba—fundamentalmente a favor de la prueba propuesta por la Metropolitan—el tribunal de instancia estableció las siguientes determinaciones de hecho:

"1. Eulogio Riera y Herminio Madera son condueños, en unión a sus respectivas esposas, de una pequeña parcela de terreno de aproximadamente de tres cuerdas y media en la jurisdicción de Carolina. Durante los últimos días del año 1959 Madera y Riera hicieron colocar en una parte visible del predio de terreno que poseen un aviso informando al público en general que la propiedad estaba a la venta. Como consecuencia de ello un agente de la Metropolitan Construction Corporation se interesó en adquirir el inmueble, iniciándose en esta forma una serie de negociaciones con miras a realizar la transacción.

2. El 30 de diciembre de 1959 el Presidente de la corporación demandada conversó durante un almuerzo con Herminio Madera. Este último le informó que la finca estaba a la venta a base de un precio de $30.00 el metro cuadrado. Jorge Rosso—quien representaba la corporación demandada—aceptó en prin-

(2) El condominio de los esposos Madera-Rodríguez Ema es de 42.86%, y el de los esposos·Riera-Rodríguez Ema de 57.41%. La parcela se valoró en $24,500 a los fines de la división de una comunidad que existió en relación con una finca de mayor cabida.

(3) En el curso del pleito el señor Madera solicitó se le incluyera como parte demandante en su carácter de administrador de la sociedad de gananciales que tenía constituida con la demandante original, "todo ello sin perjuicio de que la misma continúe con [sic] tal codemandante."

(4) Habiendo sido incluidos como codemandados los señores Madera y Riera, se trataba de una reclamación contra coparte. Regla 11.7 de las de Procedimiento Civil.

cipio los términos de la venta. En esa ocasión Riera notificó a Rosso que la parcela estaba a la venta pero sólo a condición de que se pagara por ella un precio alzado de $400,000.00. La proposición fue prontamente aceptada.

3. Rosso notificó a los vendedores que él podía pagar en el acto la suma de $50,000.00 en calidad de anticipo y el resto del precio se pagaría al tiempo de firmarse las escrituras correspondientes. En ese momento tanto Riera como Madera informaron a Rosso que ellos eran casados y que la finca pertenecía a las respectivas sociedades de gananciales. Sin embargo, ambos vendedores notificaron en ese instante a Rosso que ellos habían consultado previamente la transacción con sus respectivas esposas y que éstas habían expresado su conformidad con la propuesta venta. Ante la insistencia de Rosso de que el acuerdo fuese final, se redactó un documento a máquina conteniendo los términos de la transacción acordada el cual fue firmado por Riera, Madera y Rosso y suscrito ante un Notario amigo de Rosso que se encontraba en la oficina de éste. Las esposas de los vendedores no estaban presentes en dicho acto ni firmaron el documento.

4. La noche siguiente un agente de la corporación demandada visitó la residencia de Herminio Madera y conversó con éste y su esposa. La señora Madera preguntó al agente de la corporación sobre los planes que los oficiales de ésta tenían en mente en relación con la parcela de terreno. La señora Madera, además, se interesó en saber si la corporación planeaba construir un condominio en aquel solar a fin de ella adquirir un apartamento para una hija suya. Aproximadamente dos semanas más tarde la señora Madera se topó casualmente con el agente de la corporación demandada e inquirió de éste sobre el estado en que se encontraba la transacción acordada y la fecha en que se pagaría el precio de la finca.

5. Mientras tanto Eulogio Riera, quien tomó de Rosso el cheque por $50,000.00 que éste le entregó en calidad de anticipo la noche en que se realizó la transacción, le pidió a su esposa que depositara ese dinero en la cuenta bancaria de un negocio que ella dirige. La señora Riera endosó el cheque por $50,000.00 y lo depositó en la indicada cuenta de banco.

6. Cuando los abogados de la corporación demandada comenzaron a hacer las gestiones necesarias para la redacción de las

escrituras se dieron cuenta de la existencia de ciertos obstáculos registrales. Por razón de ello, en varias ocasiones Rosso y su abogado se reunieron con los vendedores con miras de allanar el camino para limpiar el título que habría de inscribir la corporación demandada. Mientras tanto, el valor de la parcela de terreno subió vertiginosamente, a tal extremo que a la fecha del juicio el indicado predio tenía para la corporación demandada un valor superior a un millón de dólares.

7. Coetáneamente con los trámites que realizaba su abogado, la corporación demandada inició gestiones para obtener el financiamiento necesario para las obras de construcción que realizaría en la parcela. El Presidente de la corporación se trasladó al estado de Florida y logró que un inversionista viniera a Puerto Rico a inspeccionar la propiedad. Más tarde Rosso fue a Jamaica en idénticas gestiones. Hizo varios trámites ante la Junta de Planificación de Puerto Rico y ante el Negociado de Turismo con miras a lograr que sus planes fueran viables.

8. Así las cosas, el 14 de mayo de 1960 los oficiales de la corporación demandada instruyeron a algunos obreros para que realizaran un limpieza de la parcela en litigio. A petición de la señora Madera los obreros suspendieron sus trabajos porque ésta les indicó que la finca no había sido vendida. Dos días más tarde la señora Madera radicó la presente acción en corte e hizo partes demandadas tanto a su esposo como a Riera y a la esposa de éste. También demandó a la Metropolitan Construction Corporation. Todos los demandados, con excepción de la Metropolitan, se allanaron prontamente a la demanda. La corporación, sin embargo, radicó demanda contra terceros alegando que se le habían causado perjuicios que debían ser compensados."

Haciendo referencia a las disposiciones que requieren el consentimiento expreso de la mujer para la enajenación de bienes de la sociedad de gananciales el juez a quo concluyó que en derecho la transacción nunca tuvo validez alguna ya que las señoras de Madera y Riera no dieron su consentimiento expreso para la venta de la parcela. Dictó sentencia de conformidad declarando nulo e ineficaz el contrato precedentemente transcrito, y además, declaró con lugar la demanda contra coparte y condenó a los señores Madera y Riera a satisfacer a la Metropolitan la suma de $5,000 en concepto

de daños y perjuicios. La corporación, los esposos Riera-Rodríguez Ema, y el señor Madera individualmente, recurrieron contra los pronunciamientos de la sentencia que les son adversos.

La cuestión crucial envuelta, a la luz de las propias determinaciones de hechos del tribunal de instancia, no parece haber sido considerada por el tribunal a quo al formular sus conclusiones de derecho. Frente a unos supuestos de ratificación del contrato por la esposa actora, limítase a pronunciar la nulidad del mismo, sin atribuirle efecto jurídico a los actos mencionados.(5) Establece que la transacción nunca tuvo validez alguna y cita *Molina* v. *Registrador*, 61 D.P.R. 147 (1942), *Pérez* v. *Registrador*, 62 D.P.R. 789 (1944) y *Robles* v. *Guzmán*, 67 D.P.R. 718 (1947), cuya pertinencia a la cuestión que consideramos es remota. No podemos convenir tampoco, como lo sugiere la demandante recurrida, que esta conclusión de derecho entraña una determinación de que el contrato no fue ratificado. Un examen de las alegaciones—especialmente de la llamada contrademanda y demanda de tercero de la Metropolitan—demuestra que la ratificación no se invocó como parte de la teoría de la corporación recurrente, y que después de dictada la sentencia no se intentó —mediante moción de reconsideración—a pesar de que las propias determinaciones de hecho lo justificaban, que el tribunal se manifestara sobre el efecto jurídico de los alegados actos de ratificación de la señora Madera.

 1. Los Arts. 91 y 1313 del Código Civil, 31 L.P.R.A. secs. 284 y 3672, al reconocer la facultad del marido para administrar los bienes de la sociedad conyugal, disponen que los bienes inmuebles pertenecientes a éstos no podrán ser

---

(5) El tribunal a quo va más lejos aún: declara la nulidad en cuanto al condominio de los esposos Riera-Rodríguez Ema sin haberlo éstos solicitado. Si bien es de rigor conceder, conforme a la Regla 44.3 de las de Procedimiento Civil, el remedio adecuado, ello debe ser en forma compatible con lo alegado y probado. *González Muñiz* v. *Sucn. Martín Quiñones*, 83 D.P.R. 765, 769 (1961).

enajenados o gravados, bajo pena de nulidad, sino mediante el *consentimiento expreso* de ambos cónyuges. Esta norma para regir las relaciones patrimoniales entre los esposos es una de las pocas que no tiene su precedente en el Código Civil español,[6] tal vez inspirada la Comisión Codificadora en un concepto distinto sobre la posición de la mujer dentro del matrimonio. Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico, Libro Primero*, págs. 38 y 250–253. Sin embargo, un contrato otorgado sin sujetarse al cumplimiento de estas disposiciones es ratificable.[7]

---

[6] En términos generales la legislación española acordaba una intervención limitada a la mujer en cuanto a los bienes, aun los propios. El Art. 60 del Código Civil confiere al marido la representación de su mujer y el 61 requiere la licencia marital para que la esposa pueda (1) adquirir por título oneroso o lucrativo, (2) *enajenar sus bienes*, y, (3) obligarse. El Art. 1413 autorizaba anteriormente al marido para enajenar y obligar a título oneroso los bienes de la sociedad de gananciales sin el consentimiento de la mujer. No es hasta la aprobación de la Ley de 24 de abril de 1958, que enmendó el citado Art. 1413, que se atempera este rigor al disponerse que el marido podrá obligar, a título oneroso, los bienes de la sociedad de gananciales; "pero necesitará el consentimiento de la mujer o, en su defecto, autorización judicial a solicitud fundada del marido . . . para actos de disposición sobre inmuebles o establecimientos mercantiles." También se le faculta a la mujer para que en relación con otros bienes solicite del juzgado ciertas medidas cautelares cuando los actos de disposición del marido entrañan grave riesgo para la sociedad de gananciales.

[7] En los estados en que se requiere el consentimiento de la esposa para la enajenación o disposición de los bienes de la sociedad de gananciales se admite que la ratificación subsiguiente de la esposa, bien expresa o por sus actos y conducta—en ocasiones se alude a la doctrina de impedimento por conducta (*estoppel*)—impide su impugnación. *Whiting* v. *Johnson*, 390 P.2d 985, 988 (Wash. 1964); *McGillivray* v. *Nielson*, 192 P.2d 369, 370 (Wash. 1948); *In re Horse Heaven Irr. Dist.*, 141 P.2d 400 (Wash. 1943); *O'Connor* v. *Jackson*, 74 Pac. 372 (Wash. 1903); *McKay* v. *Darusmont*, 115 P.2d 221 (Cal. 1941); *Bush* v. *Rogers*, 109 P.2d 379 (Cal. 1941); *Rice* v. *McCarthy*, 239 Pac. 56 (Cal. 1925); véanse, 10 Cal. Jur.2d, *Community Property*, § 78; Schwartz, *Gifts of Community Property: Need for Wife's Consent*, 11 U.C.L.A. L. Rev. 26 (1963); y véase además, Knutson, *California Community Property Laws: A Plea for Legislative Study and Reform*, 39 So. Cal. L. Rev. 240 (1966).

En los dos casos que envuelven el levantamiento por uno de los cónyuges de la limitación impuesta a la facultad dispositiva del otro a que nos referimos en el escolio 5, la doctrina y la jurisprudencia española

646

 Uno de los supuestos más comunes de la ratificación ocurre cuando, como observa Sánchez Román, (8) se dota de fuerza legal a un acto que carecía de ella, y que, por tanto, no era hasta entonces propiamente jurídico. La ratificación purifica el acto o contrato de los vicios de que originalmente adolecía de forma que produzca todos los efectos jurídicos que le son atribuibles; es una renuncia a invocar la causa de nulidad que lo afecta. Esta ratificación puede ser expresa o tácita, y exige una manifestación de voluntad de convalidar el contrato por quien lo ratifica, *Central Boca Chica, Inc.* v. *Tesorero de P.R.*, 54 D.P.R. 424 (1939).(9)

admiten que pueden ser ratificados los contratos celebrados sin licencia marital, Sentencias de 22 de marzo de 1965 (Revista Derecho Privado, tomo 49, pág. 517), 24 de abril de 1951 (Jurisp. Civil, II, tomo 34, pág. 818), 6 de marzo de 1945 (Jurisp. Civil, II, tomo 10, pág. 83) y 24 de mayo de 1928 (Jurisp. Civil, tomo 183, pág. 906), o sin el consentimiento uxorio que se requiere por la Ley de 24 de abril de 1958, enmendatoria del Art. 1413, Sentencia de 13 de marzo de 1964 (Revista de Derecho Privado, tomo 48, pág. 545). En cuanto a este último afirma Federico de Castro en su obra *Compendio de Derecho Civil* (3a. ed., 1966), tomo I, vol. II-1, pág. 280, que el consentimiento a que alude el Art. 1413 del Código Civil español "podrá ser expreso o tácito (facta concludentia) y suplirse por la ratificación (art. 1259)"; y Bonet Ramón, en *Código Civil Comentado* (Ed. Aguilar, 1962), pág. 1097, dice que "El consentimiento 'uxoris' como toda declaración de voluntad que no tiene prescrita una forma determinada, puede ser expreso o tácito y prestarse antes de celebrarse el negocio de disposición de que se trate, simultáneamente al otorgamiento de dicho negocio, o con posterioridad a él." Véanse además, *"En torno al artículo 1413 del Código civil y cuestiones con él relacionadas"*, Revista Crítica de Derecho Inmobiliario, tomo 37, pág. 187 (1964) y *"Protección del interés de la mujer en el patrimonio ganancial"*, Anuario de Derecho Civil, tomo 12, pág. 481 (1959).

(8) *Derecho Civil* (ed. 1911), tomo 2, pág. 554.

(9) La ratificación y la confirmación presentan características comunes e iguales efectos, pero en estricto derecho, aquélla consiste en asumir las obligaciones que emanan de un acto celebrado no por el interesado personalmente sino por otra persona que no tenía su representación o se excedió en la que le había sido conferida; la última consiste en darle validez a un acto anulable hecho por el interesado personalmente. Puig Brutau, *Fundamentos de Derecho Civil* (1954), t. II, vol. I, págs. 332–333.

En relación con actos de ratificación o confirmación, véanse, *Méndez*

Respecto a la disposición de inmuebles de la sociedad de gananciales, en *Caballero et al.* v. *Pomales et al.*, 17 D.P.R. 719 (1911), admitimos que la esposa podía ratificar un contrato de venta—a cuyo otorgamiento había comparecido solamente el marido manifestando que lo hacía con el consentimiento de aquélla—mediante su comparecencia posterior ante notario y aceptación de que se había verificado con su consentimiento y conocimiento. Véase además, *Cortijo* v. *Registrador de la Propiedad*, 21 D.P.R. 490 (1914). *Encarnación* v. *Salim*, 69 D.P.R. 766 (1949), reconoce que la esposa puede ratificar tácitamente la enajenación de inmuebles gananciales, sólo que estimamos que, conforme discutiremos luego, las actuaciones allí envueltas no eran suficientes para equivaler a la ratificación de lo actuado por el marido.

 2. Establecido que la enajenación de inmuebles por el marido sin el consentimiento de la esposa es ratificable por ésta examinemos brevemente el carácter de "expreso" a que aluden los Arts. 91 y 1313 del Código Civil, *supra*. Antes precisa aclarar que el requisito no se refiere al punto de vista notarial y registral, pues sabido es que para que produzca sus efectos en este ámbito es indispensable acreditar la intervención de la mujer en la escritura pública correspondiente o por medio de cualquier otro instrumento que tenga acceso legítimo al Registro de la Propiedad. La consideración que ahora nos merece es desde el punto de vista puramente contractual, dominado por el sistema espiritualista que informa nuestro Código Civil. Expreso no significa que indispensablemente tenga que constar por escrito, pues si tal hubiera sido el caso fácil hubiese sido indicar que se necesitaba el consentimiento escrito. Cf. Art. 172 del Código civil de California, 6 West's *Annotated California Codes*, pág. 165. El

---

v. *Registrador*, 68 D.P.R. 309 (1948); *Dooley* v. *Pantoja*, 61 D.P.R. 642 (1943); *Blanch* v. *Sucn. del Moral*, 57 D.P.R. 23 (1940); *Ruiz* v. *Registrador*, 40 D.P.R. 933 (1930); *Ledesma et al.* v. *Agrait et al.*, 19 D.P.R. 566 (1913).

alcance del precepto no puede ser otro que el de una manifestación indubitada, inequívoca, de que la mujer conociendo el contrato efectuado, lo asiente. Refiriéndonos al Art. 1043 del Código Civil, 31 L.P.R.A. sec. 2993, preceptivo de que las obligaciones derivadas de la ley no se presumen y que sólo son exigibles las "expresamente" determinadas en el código o en leyes especiales, dijimos en *Franco Oins, et al.* y *Jones* v. *Caneja,* 26 D.P.R. 518, 525 (1918), que "Donde el código dice *expresamente* ha querido decir *claramente, determinadamente, concretamente, manifiestamente . . . ."* Igual criterio es procedente en la presente situación. Quizás valga la pena advertir que como la norma responde a un deseo de proteger el patrimonio de la sociedad de gananciales, y especialmente los intereses de la mujer, se impone una apreciación restrictiva de los supuestos actos de ratificación, y que el ánimo del juzgador debe satisfacerse plenamente de que los mismos evidencian fehacientemente el consentimiento requerido. En *Encarnación* v. *Salim,* supra, pretendióse establecer el consentimiento expreso por ratificación y sostuvimos que la manifestación de la esposa al referirse al convenio hecho por su marido al efecto de que "me da lo mismo porque es para la educación de mis hijas" no constituía la ratificación de las actuaciones del marido "de tal forma que pudiera exigirse el cumplimiento específico de la oferta", (10) evidentemente aplicando el criterio restrictivo que hemos enunciado.

---

(10) "Sobre este extremo la prueba de la demandante sólo hace referencia a una conversación entre ella y Salim en la casa de este último encontrándose presente la esposa de Salim. Dicha conversación, según la relata la propia demandante, fue la siguiente:

'P. ¿Dónde vivía el Sr. Salim?

R. Por la calle Estrella.

P. ¿El Sr. Salim estaba solo?

R. Con la señora.

P. ¿Lo encontró allí?

R. Sí, señor'."

P. ¿Qué pasó en la entrevista?

R. Volvimos a tratar el asunto y entonces él me dijo: "bueno, yo se la vendería pero mi señora se opone". Yo le contesté que yo he hecho los

■ 3.—Examinemos los hechos del presente caso a la luz de las determinaciones de hechos del tribunal de instancia y de la prueba documental ofrecida. En la parcela a que se refiere el pleito, que colinda con el solar en donde ubica la residencia de los esposos Madera-Rodríguez Ema, se habían colocado dos avisos al público indicando que estaba a la venta (Exh. 3 y 4 de la demandada Metropolitan Construction Co.), hecho que, pese a las protestas de la señora Madera, ella no podía ignorar.([11]) Durante el mes de enero de 1960 unos empleados de la corporación demandada mensuraron la parcela, hecho que presenció la señora Madera. A la noche siguiente de la reunión que culminó en la firma del convenio el señor Pedro González Mena visitó la residencia de los esposos Madera-Rodríguez Ema, y en el curso de la conversación ella preguntó sobre los fines a que la compradora intentaba dedicar el inmueble, ya que si se disponía a construir un edificio residencial de condominios interesaba adquirir uno para una de sus hijas. Dos semanas después la señora Madera se topó con el mismo agente de la corporación y le preguntó sobre el negocio, "que estaba esperando el fin para irse para Europa, para España." No es hasta cerca de cuatro meses y medio después que se presenta el pleito sobre sentencia declaratoria, alegándose que la actora sólo había tenido conocimiento de la transacción dos días antes, versión que no mereció crédito al tribunal.

Estos hechos tomados y apreciados en conjunto nos llevan a la conclusión de que la señora Madera tenía conocimiento del negocio desde sus comienzos, conocía sus términos, y lo

---

contratos con usted y usted me la ofreció y yo espero que usted se decida. El me contestó: "ella no la quiere vender". Entonces la señora dijo: "me da lo mismo porque es para la educación de mis hijas".

P. ¿Ella estaba presente?

R. Sí, señor'."

([11]) En una vista celebrada en relación con una solicitud de interdicto preliminar la señora Madera aceptó que la parcela "hace tiempo que estaba en venta" (T.E. pág. 42), y que su esposo le informó en diciembre o enero de 1960 que "tenía un comprador para esa finca" (T.E. pág. 67).

ratificó con sus actos afirmativos. Aceptamos que el mero transcurso del tiempo entre el convenio y la iniciación de la acción no sería suficiente, pues lo que la ley requiere es el acto afirmativo de conformidad y no la desaprobación. Cf. *La Urbana contra Villasor y Villanueva*, 59 J. Fil. 681 (1934). Pero este hecho no puede ignorarse cuando, como en el presente caso, existen otras circunstancias indicativas de una ratificación tácita. Aquí concurren actos reveladores de la voluntad de aceptar el convenio, y no meramente una aquiescencia pasiva o vacilante. Por otro lado no es aventurado afirmar que los vendedores evidenciaron el deseo de deshacerse de la transacción. Al efecto en 21 de abril de 1960 le dirigieron una comunicación al Presidente de la Metropolitan Construction Co., con la cual devolvieron la suma de $50,000 que se había entregado como plazo inicial. En dicha carta se dice que "Huelga decirte que si los obstáculos que ahora *te impiden* comprar la finca se obviaran", refiriéndose a ciertas restricciones de utilización de parte del terreno. Es significativo que esta iniciativa correspondía al señor Rosso y que el mejor mentís a que éste fuera su deseo es que lo que alegadamente da margen al pleito es el intento de la corporación de instalar una cerca de postes de concreto en el frente de la parcela. Tampoco se hace referencia entonces a la falta de consentimiento de la señora Madera, y es sólo cuando Rosso se resiste a resolver el contrato que se recurre a la acción judicial pretextando la falta de consentimiento de una de las esposas. En cuanto a la señora Riera no era propicio incluirla como demandante alegando su falta de "consentimiento expreso" ya que su actuación al recibir el cheque de $50,000 y depositarlo en una cuenta particular de su negocio, constituía una ratificación aun más fuerte e inequívoca. *Rivera* v. *Manufacturers Life*, 34 D.P.R. 246 (1925); *Campbell* v. *Webber*, 188 P.2d 130 (Wash. 1947); cf. *Dooley* v. *Pantoja*, supra.

La conclusión a que hemos llegado nos releva de considerar los errores apuntados en los recursos interpuestos por los esposos Riera-Rodríguez Ema y el señor Madera.

*Se revocará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en 3 de julio de 1962, y en su lugar se dictará sentencia estableciendo que el contrato de 4 de enero de 1960 es válido por haber sido debidamente ratificado y que las obligaciones que dimanan del mismo son exigibles.*

El Juez Presidente Señor Negrón Fernández no intervino. Los Jueces Asociados Señores Belaval y Santana Becerra disintieron.